TERRELL N. ROBERTS, III*
Attorney for Plaintiff
6801 Kenilworth Avenue, Suite 202
Riverdale, Maryland 20737
Telephone: (301) 699-0764
Fax: 301 699 -8706
Email: troberts@robertsandwood.com

*Application for admission pro hac vice pending

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| TROY EDWIN NEHLS | Case No. 3:25-cv-112 |
| Plaintiff, | **COMPLAINT FOR INVASION OF PRIVACY; TRESPASS; VIOLATION OF CONSTITUTIONAL RIGHTS.** |
| v. | |
| UNITED STATES OF AMERICA | |
| Defendant, | |

TROY EDWIN NEHLS, Plaintiff, by and through his attorney of record, brings this Complaint against the UNITED STATES OF AMERICA, and alleges as follows:

**JURISDICTION AND VENUE**

1. This Court has subject matter jurisdiction over this case by operation of 28 U.S.C. §1331 and §1346(b).

2. Venue is proper in this district under 28 U.S.C. §§ 1331 and 1402(b).

**PARTIES**

3. Plaintiff TROY EDWIN NEHLS is, and at all times relevant to this case was, a United States congressman who represents the people of the 22nd Election District in the State of

Texas. He resides in Ft. Bend County, Texas, which is in the jurisdiction of the United States District Court for the Southern District of Texas.

4. Defendant UNITED STATES OF AMERICA is sued under the provisions of the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2671, *et seq*. This is a civil action based on (1) an injury, (2) for money damages, (3) caused by the intentional or wrongful acts of one or more employees of the federal government, (4) while acting within the scope of their office or employment, 5) under circumstances where the United States, if a private person, would be liable to Plaintiff in accordance with the laws of the District of Columbia, where the acts or omissions occurred.

5. Plaintiff has timely satisfied administrative exhaustion requirements by first presenting his claims to the United States Capitol Police ("Capitol Police" or "USCP") within two years after the claims accrued, as required by 28 U.S.C. §§ 2401 and 2675. Plaintiff's standard form 95 was delivered to the Capitol Police on October 30, 2023, and augmented by a correction to the Form 95 delivered on November 21, 2023.

6. The Capitol Police is the federal law enforcement organization responsible for policing the United States Capitol Buildings and Grounds under the direction and support of the Capitol Police Board, which consists of the Sergeant at Arms of the United States House of Representatives, the Sergeant at Arms of the United States Senate, and the Architect of the Capitol. The Capitol Police have the power to make arrests within the Capitol Buildings and Grounds for violations of any laws of the United States or the District of Columbia. The legislative branch of the United States is a federal agency within the meaning of 28 U.S.C. § 2671, *et seq*. Officers and employees of the legislative branch, including employees of the Capitol Police, are employees of

the federal government within the meaning of 28 U.S.C. § 2671, *et seq*. At all times relevant to this Complaint, these employees were acting within the scope of their office or employment.

## FACTS COMMON TO ALL COUNTS

7. As a sitting congressman, Plaintiff TROY EDWIN NEHLS (hereafter "Congressman Nehls" or "Congressman") was provided a congressional office in room #1104 of the Longworth House Office Building in Washington, D.C., which is located adjacent to the United States Capitol.

8. The events described in this complaint have a nexus to the events at the U.S. Capitol on January 6, 2021. Congressman Nehls, a Republican, was one of five congressmen selected by then Republican leader Kevin McCarthy to serve on a House Committee investigating the events of January 6th. He was a vocal critic of the Capitol Police and its leadership's failures in relation to the events that occurred on January 6th. In particular, he strongly criticized a Capitol Police officer's shooting of Ashli Babbitt, referring to it as legally indefensible and calling for a grand jury investigation of the officer. https://www.facebook.com/share/v/18fn72Gdo2/.

9. On Saturday, November 20, 2021, Congressman Nehls and his staff were not in his office. Congress was out of session, and members had left for the Thanksgiving holiday.

10. Congressman Nehls had a whiteboard in his office. On the whiteboard, he had written notes and drawings about legislation he was drafting at that time. His notes contained his confidential thoughts and ideas about the legislation, and he expected that no one, other than himself or his staff, would view and read his writings on the whiteboard in his office. Those writings were on the Congressman's whiteboard on November 20th.

11. At approximately 3:35 p.m., a USCP officer, Private First Class Kevin Dias #7338, was on duty, and he entered the Congressman's office. He did so without the Congressman's

permission, consent or knowledge, and without prior lawful approval of a supervisor. The officer did not have a search warrant authorizing a search of the Congressman's office as well.

12. Inside the office, Officer Dias saw the Congressman's whiteboard. He read the Congressman's notes and drawings and took a photograph of the whiteboard. He then departed the Congressman's office.

13. At 4:00 p.m., Officer Dias completed a PD-76 *Stop and Contact Report*. The report stated as follows:

> At approximately 1535 hrs on 11/20/21, R/O was conducting yellow alert checks of the Longsworth Building when he found room 1104 member and staff only door wide open with no one in the area. R/O announced his presence and checked the area. During his checks R/O noticed a White Board with suspicious writings mentioning body armor with an outline of the Rayburn Building next to the Longworth building with an "x" marked at the C Street entrance of the Rayburn. R/O locked the door to the office and notified his supervisors. Special Agent Andriko T. was notified and will be following up.

14. Officer Dias' report is inaccurate and false in several respects:

　　a. The officer stated that his entry was premised on a "yellow alert check." By USCP regulation, yellow alert checks are done if there is reason to believe that a bomb or explosive device is on Capitol grounds. Such checks must be authorized by a Watch Commander, the Command Center, or a supervisor. At that time, there was no reason to believe a bomb or explosive device was on Capitol grounds. Furthermore, a Watch Commander, Command Center or a supervisor had not authorized a yellow alert check on November 20th.

　　b. The member-and-staff-only door through which the officer had entered was not "wide open." Mechanically, it was a self-closing door. It was inspected by the Architect of the Capitol after this incident and found to be in good working order. For that door to have been wide open, it would have to have been propped

4

open in some manner, and it was not. The door was fully closed and locked. A cleaning crew had been in the Congressman's office on the evening of November 19th. It was the practice and habit of the cleaning crew to enter private congressional offices with a key and leave the offices locked when they leave. In addition, the Congressman's staff was not working in the office on the 20th, and no one entered the office after the cleaning crew left, at least not until Officer Dias did so on that day.

c. It would not have been immediately apparent to any reasonable police officer in Officer Dias' position that the writings on the whiteboard were evidence of a crime that was committed or about to be committed. In a later interview conducted by the Office of Inspector General, Officer Dias stated that he was suspicious about the words "Body Armor," "remove BM," "NIJ cert for import," "Chinese EAR," and "Felony to fake NIJ cert." He further stated that he was concerned a "rough map had been drawn of the Rayburn and Longworth Buildings with an 'X' marking the spot of the Rayburn and C Street garage entrance." The right of the people to be secure in their "papers and effects" is protected by the Fourth Amendment, and a reasonable officer in Officer Dias' position would not have believed that reading and/or photographing the Congressman's notes was appropriate or legally justified. A reasonable Capitol Police officer instead would immediately have recognized the notes for what they were, i.e., notes by the Congressman and his staff pertaining to drafting legislation.

15. At 6:35 p.m. on the 20th, Officer Dias called Private First Class (PFC) Thomas P. Andriko, an officer in the "Threat Assessment Section" of the USCP. Officer Dias advised that he had observed an open door in Congressman Nehls' Room 1104 and entered the office. Officer Dias further told Officer Andriko that he observed a whiteboard that contained writings about body armor, a reference to China, and a "map" of the Rayburn and Longworth Buildings, and that he had taken a photograph of the congressman's whiteboard.

16. At 11:36 p.m. on the 20th, Officer Dias sent PFC Andriko the completed PD-76, along with a copy of the photograph of Congressman Nehls' whiteboard. On November 21, 2021, PFC Andriko decided that the material looked like an "Intell" thing, and he discussed it with his supervisor, Sergeant David Millard, who was in the Threat Assessment Section ("TAS) of the USCP. Sergeant Millard forwarded the PD-76 and the photograph via email to three sergeants in the Intelligence Operations Section of the USCP. One of those sergeants was Sergeant Kim Seifert.

17. On Monday, November 22nd, three USCP officers from the Capitol Police's intelligence unit appeared at Congressman Nehls' office unannounced. These officers were PFC Kevin Currie, PFC Kyle Blasy, and PFC Usman Saleem. They were not dressed as police officers. PFC Currie was dressed in blue jeans and a hooded sweatshirt, and the other two were in "Carhartt" pants. Upon information and belief, the officers came to the Congressman's office because they did not expect to find anyone in the office. However, a legislative assistant to Congressman Nehls was in the Congressman's office working and answered the knock at the door.

18. The legislative aid thought from their appearance that the men were construction workers. One or more of the men at the door identified themselves as police officers and then posed questions about Officer Dias' photograph and what the writings on the whiteboard meant. The aide explained that the notes on the whiteboard reflected the Congressman's work on drafting

6

legislation. In response to more questions, the aide stated that an "X" was written on the whiteboard to show an intern where the House's ice machine was. At no time did the officers seek permission from Congressman Nehls or his chief of staff to speak to his staff about his legislative activities or the Congressman's writings.

19. In connection with an investigation conducted by the Office of Inspector General, USCP Sergeant Salvatore Guigliano, who had become familiar with Officer Dias' actions in reference to Congressman Nehls's office, stated that the officer's actions "were all over the place and not pertinent." Sergeant Guigliano further determined that Officer Dias' concerns "could wait to be addressed when he returned to work on Monday, November 21, 2021." When Guigliano arrived at work on the following Monday, Sergeant Seifert had already assigned Officer Dias' report to PFC Currie for investigation. PFC Currie subsequently reported to Sergeant Guigliano that he had spoken to the Congressman's legislative assistant, showed him the photograph of the whiteboard, and concluded that nothing suspicious had occurred, that no further investigation was warranted, and that it did not meet the threshold for filing with the Department's record management system. Sgt. Guigliano further stated to OIG that this was the first time that he had heard of a police officer photographing a whiteboard and notes in a congressperson's office. He also stated that the mission of the USCP was to protect the Members of Congress, not to investigate them in the manner which occurred here. Sgt. Guigliano added that he did not understand what Officer Dias was thinking when he took the photograph of the whiteboard.

20. On Tuesday, November 23rd, at 6:26 p.m., Officer Kenneth Williams entered the PD 76 report and the attached photograph into the Records Management System of the USCP. Thus, these documents became a permanent record of the Capitol Police.

21. Congressman Nehls was later informed by his staff of the unauthorized entry of his office, the photographing of his whiteboard, and the questioning of his staff about the contents of his writings on the whiteboard. He was appalled and outraged by the invasion of his privacy, and he regarded the actions of the Capitol Police to be a threat to the liberties of the people of his district and the nation as a whole. He complained to the Chief of Police and followed up with a request to Inspector General Michael Bolton of the U.S. Capitol Police for a formal investigation.

22. Under the United States Constitution, a congressman's exercise of the right of speech and debate is a matter as to which he "shall not be questioned."[1] Not only had a police officer read the Congressman's notes about pending legislation, but the Capitol Police officers also sent three officers to his office and questioned a member of his staff about the Congressman's private notes and what they meant. This was an infringement of the Congressman's rights under the speech and debate clause.

23. Under the First Amendment, the Congressman had the right to speak out and criticize the government. The actions of the Capitol Police on the 20th of November were in retaliation to the Congressman's speech and vocal criticism and violated his rights under the First Amendment.

24. Congressman Nehls was outraged and appalled by the violation of his privacy and constitutional rights. A police officer, acting without permission, had never taken a photograph of a congressman's notes inside the congressman's office before this time, and it was completely unheard of. Further, the Capitol Police treated the matter as criminal in nature, impairing the Congressman's reputation. He has suffered mental and emotional distress, anxiety, and humiliation. He has had to worry that he was targeted for his criticism of the Capitol Police and

---

[1] US Const., Art. I, § 6.

that he may be subject to additional searches of his office. He took precautions and asked the Architect of the Capitol to sweep his office for listening devices. He remains worried and anxious about what else the Capitol Police might do to him.

### COUNT ONE -- INTRUSION ON PRIVACY

25. Officer Dias' entry into the Congressman's private office and photographing his private notes intruded on his thoughts, ideas and plans for legislation that he had drafted and intended to present to Congress. He expected his notes would be private and confidential.

26. Intrusions of this kind would be highly offensive to an ordinary reasonable person, and it was so for Congressman Nehls as well.

27. As a direct result of the exposure of his notes, his notes were photographed, and he was subjected to a criminal investigation. His reputation was impaired. He became concerned that he had been spied upon and that it could happen again to him. He suffered indignity and mental and emotional distress. The events interfered with his duties as a Congressman and impaired his effectiveness.

### COUNT TWO -- PUBLICATION OF PRIVATE FACTS

28. USCP officers had reason to know that the secrecy of the Congressman's notes were protected from intrusion by the Speech and Debate Clause and the First Amendment and Fourth Amendment of the Constitution. Entering and searching the Congressman's office, photographing his private whiteboard, and placing a report of his suspected criminal activities in the permanent record of the USCP -- amounted to the wrongful publication of private facts about the Congressman and an intrusion on his privacy.

29. Publication of private facts impaired the Congressman's reputation and produced mental and emotional distress as well as indignity, humiliation, and anxiety.

**COUNT THREE -- TRESPASS**

30. Officer Dias' made a physical entry into Congressman Nehls' congressional office without his consent or knowledge. This wrongfully interfered with the Congressman's possessory interests and deprived him of the use, enjoyment, and privacy of his office. The Congressman suffered indignity and was deeply offended by the audacity of a police officer's trespass on his private congressional office.

**COUNT FOUR -- VIOLATION OF CONSTITUTIONAL RIGHTS**

31. Congressman Nehls had a reasonable expectation of privacy in his office and in his private notes, which concerned legislation under consideration.

32. Officer Dias lacked probable cause or a reasonable suspicion to believe that the Congressman was engaged in criminal activity. The officer failed to seek a search warrant before entering the office, and he lacked a lawful justification to enter the Congressman's office and conduct a search by reading his notes and photographing them, which amounts to a search and seizure violative of the Fourth Amendment.

33. The action of Officer Dias and treating the matter as a criminal investigation was a form of retaliation for the Congressman's exercise of free speech and outspoken criticism of the Capitol Police.

34. The Congressman's rights under the Speech and Debate Clause of the Constitution were violated by reason of Officer Dias' reading and photographing the Congressman's notes on his whiteboard and questioning the Congressman's staff about the meaning of his writings on the whiteboard.

35. Congressman Nehls suffered injury and losses, as alleged previously.

**DEMAND FOR RELIEF**

Plaintiff Congressman Nehls prays that this Court enter a judgment in his favor against the Defendant, the United States of America, for $2,500,000 in monetary damages, plus costs and interest according to law, and any and all further relief to which Plaintiff may be justly entitled.

Dated: April 10, 2025  /s/ *Terrell N. Roberts, III*
Terrell N. Roberts, III
Attorney in Charge for Plaintiff
State Bar# (Not applicable)[2]
AIS No. 7712010305
6801 Kenilworth Avenue, Suite 202
Riverdale, Maryland 20737
301-699-0764 (office)
301-699-8706 (fax)
troberts@robertsandwood.com

---

[2] Attorney's Office is in the State of Maryland. He is a member of the Bar of the State of Maryland, but the State of Maryland does not assign bar numbers for members. He has provided his AIS number, also referred to as a Client Protection Fund (CPF) Number.